UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

NORTH AMERICAN PRECAST, INC. and
WISEMAN CONSTRUCTION, INC.

     Plaintiffs,

v.                           CIVIL ACTION NO. 2:04-1306

GENERAL CASUALTY COMPANY OF WISCONSIN,
a Wisconsin corporation

     Defendant.

MEMORANDUM OPINION AND ORDER

Pending are cross-motions by plaintiffs and defendant for summary judgment, both filed September 23, 2005.

I.

The parties filed, on September 23, 2005, a stipulation of facts.  According to that document, they agree as follows.

Plaintiff Wiseman Construction Inc. ("Wiseman"), a West Virginia corporation, entered into a contract with plaintiff North American Precast, Inc. ("North American"), an Ohio entity, under which North American would design, manufacture and supply

"precast, pre-stressed, hollow core concrete panels or 'planks' in the construction of" a Juvenile Detention Center in Boone County, West Virginia.  (Stip. ¶¶ 1,2,7,8).  Wiseman was to act as general trades contractor in building the juvenile detention center pursuant to its successful bid for the public works project.  (Id. ¶ 6).  The original contract amount neared $12 million.  (Id.).  In exchange for providing the planks, North American was to be paid $61,776.  (Id. ¶ 8).  North American had no responsibility with regard to the installation of the panels. (Id. ¶ 12).

Under its contract with Wiseman, North American agreed to provide comprehensive insurance coverage and to name Wiseman as an additional insured under its policy, with which agreement it complied.  (Id. ¶ 9).  A certificate of coverage was issued by defendant General Casualty Company of Wisconsin ("General Casualty"), a Wisconsin corporation, through its agent, and that certificate named Wiseman as an additional insured.  (Id.).

On July 1, 2002, there was a collapse of one of North American's installed panels at the job site of another contractor, G&G Builders, Inc., at a jail being constructed in Cabell County, West Virginia.  (G&G Stip. ¶ 13).  Personnel of North American were dispatched to the scene that day and at least

2

one other North American representative arrived sometime
thereafter.  (Young Depo. at 37; Simonetta Depo. at 12, both
attached as Ex. A to Pls.' Resp. to Def. Surreply).

On August 27, 2002, "following delivery of some of the
planks to the [Wiseman] Project site, an incident occurred which
resulted in a plank buckling and separating apart as it was being
lifted from the delivery truck."  (Stip. ¶ 11).  The record
regarding the events surrounding this incident is sparse.

The deposition of the principal of Wiseman, John
Wiseman, explained the circumstances after the buckling and
separating of the panel.

    A    When they went to lift it off the truck, it just
         collapsed within itself.

    Q    All right.  What happened next?

    A    Well, the owner then requested that all planks be
         examined, and they hired independent inspections
         to be done on the planks.  URS's engineers also
         come [sic] to the job site.

    Q    Now, when the owner made this request that the
         planks be examined, did that stop the installation
         of the plank?

    A    We continued for a couple more days and had
         probably 90 percent of the planks in place, and
         then we got a stop work order from the State and
         the architect.  Not only did it have a stop work
         order, but it told us that we could not even go
         into those sections of the building.

(Wiseman Depo. at 40-41, attached as Ex. A to Pls. M.S.J.).  The panels were apparently "in place and ready for grouting and top coating at the time of initial rejection . . . on August 28, 2002."  (Beers Rpt. at 6, attached as Ex. C to Stip.).

It thus appears that some of the panels were installed before August 27, 2002, and they continued to be installed for a couple of days after the breaking of the panel.  Both before and after that date, it appears that 90% of the panels were furnished and installed.

The State, as the project owner, soon issued the stop-work order, perhaps as early as August 28, 2002, and, together with Wiseman and North American, began an investigation.  (Stip. ¶¶ 14-15; 08-12-04 Johnstone Demand Ltr. to Gen. Cas. at 2, attached as Ex. B to Stip.; 10-25-04 Settlement and Assignment of Claims in N.D. Ohio, Civil Action No. 04-78, ¶ 3, attached as Ex. D to Stip.).  The State required replacement of "some of the planks."  (Stip. ¶ 16).  The stop-work order was not lifted until November 2002.  (Id. ¶ 17).[1]

---

[1] Defendant additionally asserts no coverage obligation arises inasmuch as plaintiffs putatively failed to provide seasonable notice of the claims.  According to the policy, plaintiffs were obliged to apprise defendant, "as soon as practicable[,]" of the events giving rise to the coverage obligation.  The Supreme Court of Appeals of West Virginia has

**4**

On January 27, 2003, North American filed a lawsuit against Wiseman alleging breach of contract for failure to pay the amount due in the purchase order.  (Id. ¶ 18).  Wiseman countersued North American and presented its insurance claims to defendant, General Casualty.  (Id. ¶¶ 19-20).  Defendant denied coverage.  (Id. ¶ 21).  Meanwhile, Wiseman and North American litigated amongst themselves for nearly two years.  (Id. ¶ 22). Eventually, North American confessed judgment upon Wiseman's claims in the amount of $539,241 and assigned its rights under the policy to Wiseman. (Id. ¶¶ 26-27).

Plaintiffs filed this action in this court on December 16, 2004, seeking a declaratory judgment that their claims are covered under the policy of insurance (Count I), and further alleging causes of action for breach of contract (Count II), and

---

observed that phrases describing the time within which notice must be given reduce, regardless of their unique verbiage, to whether the insured provided reasonable notice.  State Auto. Mut. Ins. Co. v. Youler, 183 W. Va. 556, 561, 396 S.E.2d 737, 742 (1990).  As one might expect, the question of reasonable notice is reserved to the fact finder, at least where the insured offers some explanation for the length of delay.  See Youler, 183 W. Va. at 561, 396 S.E.2d at 742; Dairyland Ins. Co. v. Voshel, 189 W. Va. 121, 124, 428 S.E.2d 542, 545 (1993); Colonial Ins. Co. v. Barrett, 208 W. Va. 706, 712, 542 S.E.2d 869, 875 (2000).  The fact finder's multi-faceted inquiry is focused on (1) prejudice to the investigative interests of the insurer, (2) the reasons for delay, and (3) the length of delay.  See syl. pt. 2, in part, Youler, 183 W. Va. at 556, 396 S.E.2d at 737.

bad faith and unfair claim practices (Count III).  By order dated August 19, 2005, the court instructed the parties to confine briefing on the motions for summary judgment to the question of coverage.

II.

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Material facts are those necessary to establish the elements of a party's cause of action.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Id.  The moving party has the burden of showing -- "that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the movant satisfies this burden, then the non-movant

6

must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial.  Id. at 322-23; Fed. R. Civ. P. 56(c).  A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-moving party.  Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

Conversely, summary judgment is not appropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party.  Anderson, 477 U.S. at 248.  Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute.  Overstreet v. Kentucky Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991).

In reviewing the evidence, a court must neither resolve disputed facts or weigh the evidence, Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility.  Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986).  Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor. Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979).  Inferences that are "drawn from the underlying facts

7

. . . must be viewed in the light most favorable to the party opposing the motion." <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962).

III.

Plaintiffs suggest that the court must determine whether West Virginia or Ohio has the most significant relationship to the dispute and apply the law of that state, which they propose is West Virginia, because there is no choice of law provision in the contract.  Defendant, on the other hand, contends that because it is determining coverage issues, the court should look to the law of the state in which the parties contracted for insurance.  The place of contracting appears to be Ohio, where the policy was sold.

The parties agree that choice of law issues must be resolved by application of the law of the state in which the court sits.  <u>Klaxon Company v. Stentor Electric Elec. Mfg. Co.</u>, 313 U.S. 487, 496 (1941).  The Supreme Court of Appeals of West Virginia has held:

> In a case involving the interpretation of an insurance policy, made in one state to be performed in another, the law of the state of the formation of the contract shall govern,

8

> unless another state has a more significant
> relationship to the transaction and the
> parties, or the law of the other state is
> contrary to the public policy of this state.

Syl. pt., <u>Liberty Mutual Insurance Company v. Triangle
Industries, Inc.</u>, 182 W. Va. 580, 390 S.E.2d 562 (1990).  The
formation of the contract appearing to have taken place in Ohio,
the law of Ohio governs, unless West Virginia is shown to have a
more significant relationship to the events and the parties.

In <u>Triangle Industries</u>, the court noted its
consideration of the Restatement (Second) of Conflict of Laws to
determine which state has the most significant relationship.
<u>Triangle Industries</u>, 182 W. Va. at 585, 390 S.E.2d at 567.
Within two years, however, the court decided <u>Joy Technologies,
Inc. v. Liberty Mutual Insurance Company</u>, 187 W. Va. 742, 421
S.E.2d 493 (1992), and though it relied on the holding of
<u>Triangle Industries</u>, the court appears to have abandoned the
formal Restatement analysis.  The court instead began its survey
by noting simply that "the injury occurred in West Virginia, the
instrumentality of the injury was located in West Virginia, and
the forum selected to try the issues was West Virginia."  <u>Joy
Technologies</u>, 187 W. Va. at 746, 421 S.E.2d at 497.  The court
continued, "These factors suggest that West Virginia has had a
very significant relationship to the transaction and the parties.

9

In fact, the relationship would appear to be more substantial than that of [the state] where the contract was formed."[2]  Id.

Under the guidance provided by Joy Technologies, it appears that West Virginia's relationship to this controversy is more substantial than that of Ohio.  The General Casualty policy was issued to defendant North American, located in Stow, Ohio, through General Casualty's agent located in Solon, Ohio.  (Stip. at 1).  The connection with Ohio ends there.[3]  The additional certificate of coverage was issued to Wiseman, a West Virginia corporation, specifically for the regional juvenile facility project, which the parties at all times knew would be located in West Virginia.  The insured risk was found in West Virginia, and

---

[2]     While the court observed that these factors alone could justify application of West Virginia law, it found further support for its decision after determining that application of the law of Pennsylvania, where the contract had been formed, would result in a violation of the public policy of West Virginia.  Joy Technologies, 187 W.Va. at 746, 421 S.E.2d at 497.

[3]     Defendant produces a memorandum written on July 26, 2004, by Michael Fortney, counsel for plaintiff North American, to Thomas Rosenberg, counsel for General Casualty, in which North American's position on the coverage issue is summarized. Defendant argues that in the memorandum North American "relies exclusively upon Ohio law in interpreting [t]he [p]olicy," (Def. Memo. in Supp. of M.S.J. at 7), and that this reliance shows that North American "has consented to Ohio's jurisdiction . . ."  The position of North American's counsel prior to the institution of this litigation has no bearing, however, on which state has the most significant relationship to the controversy.

10

there is no dispute that the injury occurred in this state as
well.  For these reasons, the law of West Virginia should be
applied in determining the coverage issue.


IV.


The commercial general liability ("CGL") insurance
policy at issue provides as follows for property damage liability
under section 1, coverage A, subsection 1.b.:

This insurance applies to "bodily injury" and "property
damage" only if:

(1) The "bodily injury: or "property damage" is
caused by an occurrence that takes place in the
"coverage territory";

(Policy) (emphasis added).  Section V sets forth policy
definitions that includes: "Occurrence" means an accident,
including continuous or repeated exposure to substantially the
same general harmful conditions."  Id.  (emphasis added).

An accident is defined as "'an event occurring by
chance or arising from unknown causes' . . . [and] 'generally
means an unusual, unexpected and unforeseen event. . . . An
accident is never present when a deliberate act is performed
unless some additional unexpected, independent and unforeseen
happening occurs which produces the damage. . . . To be an

11

accident, both the means and the result must be unforeseen, involuntary, unexpected, and unusual.'" State Bancorp v. U.S. Fidelity and Guar. Ins. Co., 199 W. Va. 99, 105, 483 S.E.2d 228, 234 (1997) (per curiam) (internal quotations omitted).

The fundamental threshold issue is thus whether an accident has taken place such that an occurrence has been demonstrated under the policy. See Webster County Solid Waste Authority v. Brackenrich & Associates, Inc., 217 W.Va. 304, 310, 617 S.E.2d 851, 857 (2005). "Absent an occurrence, as that term is defined under the policy, there can be no coverage under the policy at issue, or any other commercial general liability policy." Id. (analyzing substantially the same or similar policy language).

The Supreme Court of Appeals of West Virginia has made it clear that "'[c]ommercial general liability policies are not designed to cover poor workmanship. Poor workmanship, standing alone, cannot constitute an "occurrence" [footnote omitted] under the standard policy definition of this term as an "accident . . . ."'" Syl. pt. 2, Brackenrich, 217 W. Va. 304, 617 S.E.2d 851, (2005) (quoting syl. pt. 2, Corder v. William W. Smith Excavating Co., 210 W. Va. 110, 556 S.E.2d 77 (2001)); accord Erie Ins.

Property and Cas. Co. v. Pioneer Home Improvement, Inc., 206 W.
Va. 506, 511-512, 526 S.E.2d 28, 33-34 (1999).

In Pioneer, homeowners sued a contractor alleging
breach of contract for his poor workmanship. Pioneer, 206 W. Va.
at 508, 526 S.E.2d at 30. The contractor's insurance company
initially defended under a reservation of rights before it filed
the declaratory judgment. Id. at 507, 29. The damages at issue
under the policy were limited to those costs arising out of the
repair and replacement of the defective workmanship. Id. The
court explained that "CGL policies of insurance do not provide
protection for poor workmanship; instead, these policies protect
an insured from liability due to personal injury or property
damage to others caused by the insured's negligence." Id. at
511, 33. The Supreme Court of Appeals then held that "damages to
a building sustained by an owner as a result of a breach of a
construction contract due to a contractor's faulty workmanship
are a business risk to be borne by the contractor and not by his
commercial general liability insurer." Id. at 512, 34.

Pioneer illuminated this proposition with the following
quotation.

We quote with favor from Weedo v. Stone-E-Brick, Inc.,
81 N.J. 233, 249, 405 A.2d 788, 796 (1979), wherein the
Supreme Court of New Jersey stated, "As we have

13

endeavored to make clear, the policy in question does not cover an accident of faulty workmanship but rather faulty workmanship which causes an accident." (Citations omitted).  The following illustration was offered in <u>Weedo</u> to mark the distinction between "business risks" and "occurrences" which give rise to insurable liability:

> When a craftsman applies stucco to an exterior wall of a home in a faulty manner and discoloration, peeling and chipping result, the poorly-performed work will perforce have to be replaced or repaired by the tradesman or by a surety.  On the other hand, should the stucco peel and fall from the wall, and thereby cause injury to the <u>homeowner or his neighbor standing below or to a passing automobile</u>, an occurrence of harm arises which is the proper subject of risk-sharing as provided by the type of policy before us in this case.  The <u>happenstance</u> and extent of the latter liability is <u>entirely unpredictable</u> -- the neighbor could suffer a scratched arm or a fatal blow to the skull from the peeling stonework.  Whether the liability of the businessman is predicated upon warranty theory or, preferably and more accurately, upon <u>tort concepts</u>, injury to persons and damage to other property constitute the risks intended to be covered under the CGL.

<u>Id.</u>, 81 N.J. at 240-41, 405 A.2d at 791-92.

> We summarize by stating that CGL policies of insurance do not provide protection for poor workmanship; instead, these policies protect an insured from liability due to personal injury or property damage <u>to others</u> caused by the insured's negligence. The circuit court correctly determined that Erie had no duty to indemnify Pioneer for the faulty installation of siding and other work performed on the Skanes' residence.

<u>Pioneer Home Improvement</u>, 206 W. Va. at 511-512, 526 S.E.2d at 33-34 (emphasis added).

14

The proper role of a CGL policy, according to West
Virginia law, is "not [to] insure the work or workmanship which
the contractor or builder performs.  They are not performance
bonds or builders' risk policies."  Id. at 511, 33.

In Corder, the plaintiff sought loss-of-use damages
based on an alleged occurrence stemming from a sewer pipe
failure.  Corder, 210 W. Va. at 116, 556 S.E.2d at 83.  The
Supreme Court of Appeals noted these damages were distinct from
the request in Pioneer for the replacement and repair of the
defective workmanship on the home.  Id.  Though Corder found a
remand necessary because the record was deficient as to the cause
of the sewer pipe's failure, it nevertheless "agree[d] with the
lower court's conclusion [in citing to Pioneer for the
proposition] that commercial general liability policies are not
designed to cover poor workmanship."  Id.

In Brackenrich, the county solid waste authority sued
the contractor and engineering firm for the faulty design,
engineering, and inspection of a landfill.  Brackenrich, 217 W.
Va. at 307, 617 S.E.2d at 854.  All of the claims alleged were
based upon faulty workmanship.  Id. at 309, 856.  The Supreme
Court of Appeals found that none of the three -- the defective

15

design, engineering, or inspection of the landfill -- constituted

an occurrence within the meaning of the policy.  Id. at 311, 858.

Syllabus point 3 of Brackenrich provides:

> Rather than providing coverage for a product or work
> performance that fails to meet contractual
> requirements, the commercial general liability policy
> is specifically designed to insure against the risk of
> tort liability for physical injury sustained by third
> parties as a result of the product or work performed or
> damages sustained by others from the completed product
> or finished work.  Because faulty workmanship claims
> are essentially contractual in nature, they are outside
> the risks assumed by a traditional commercial general
> liability policy.

Id.

        Plaintiffs contend there were two accidents, either of

which constitute an occurrence under the policy.  (Pls.' Resp. to

Def. M.S.J. at 4; Pls.' Reply to Resp. to M.S.J. at 6).  The

plaintiffs first argue that an accident occurred when a single

panel buckled and separated upon being removed from the delivery

truck.  (Id.).  Secondly, the plaintiffs contend that, once

installed, the failures of the installed panels were discovered

upon investigation and testing of the panels by the plaintiffs

which revealed the crumbling and cracking that had taken place --

an accident, plaintiffs say.  (Id.).

        It is noted that the complaint alleges that "[a]s a

direct, proximate and foreseeable result of [the] failure of

16

NAP's plank Wiseman incurred a substantial monetary loss in the amount of at least Five Hundred Thirty-Nine Thousand Two Hundred Forty-One Dollars ($539,241.00) for property damage and loss of use, including but not limited to the following:

     a.   Damage to Wiseman's product;

     b.   Substantial adverse impacts to Wiseman's planned manner and method of performance, including delays and inefficiencies resulting from loss of use and access to the structure;

     c.   Substantial unanticipated costs for inspection, repair, plank replacement, testing of the completed roof structure and remediation resulting from the collapse of the failed plank;

     d.   Unanticipated additional costs made necessary by Wiseman's changed manner and method of performance;

     e.   Additional incidental and consequential damages.

(Compl. ¶ 13). Later, plaintiffs summarize their claim for damages as consisting of three categories: property damage to the detention structure, loss of use of the building, and "collateral damage" such as the costs of testing and repairing the structure itself. (Pls. Reply to Def. Resp. to M.S.J. at 2; Pl. Resp. to Def. M.S.J. at 3).

A review of the agreed upon stipulation of facts does not suggest there was any physical damage to the juvenile detention center then under construction that was inflicted by

the buckling of the solitary plank as it was removed from the truck.  (Stip.).  The crumbling and cracking of the panels are not even mentioned in the stipulation or otherwise supported by evidence and only appear in the briefs of the plaintiffs.  In any event, it is not indicated that any such crumbling and cracking inflicted physical damage on the juvenile center.

Moreover, the report of Robert L. Beers, Jr., ("Beers Report") attached as an exhibit to the stipulation, does not mention or provide any evidence of physical property damage occasioned by the buckling of the plank as it was removed from the truck.  The Beers report was used to calculate the damages suffered by Wiseman.  (Stip. ¶ 24).  The discussion of damages in the report was limited exclusively to "delay costs."  (Beers Rpt. at 7-8, attached as Ex. C to Stip.).  The Beers report concludes with the following table:

| | | |
|---|---|---|
| 1. Extended Performance Costs | $ | 129,754 |
| 2. Subcontractor & Owner Claims | | 269,780 |
| Subtotal | $ | 399,534 |
| 3. G.C. Markup (Self Performed) – 15% | | 19,463 |
| 4. Bonding 1.75% | | 6,992 |
| Subtotal | $ | 425,989 |
| 5. Interest | | 113,252 |
| Total Precast Delay Costs | $ | 539,241 |

(Id. at 8).

18

There is no evidence in the record to support the
argument that either the buckling of the panel while being taken
off the truck or any cracking and crumbling of the installed
panels caused tortious injury to any third party or physical
damage to the rest of the juvenile detention center structure
itself.  The only evidence of damages in the record for the
Wiseman project is based on replacement of some of the panels and
the loss of use or delay suffered, expensive though it was, as
explained in the report of plaintiffs' expert, Robert Beers.[4]
(Stip. ¶ 24).

The claims for loss of use or delay and even the
"collateral damage" such as to test and replace the panels stem
solely from the defective nature of the panels and are merely
stand-alone poor workmanship claims.  In view of the West
Virginia authority set forth in <u>Brackenrich</u>, <u>Corder</u>, and <u>Pioneer</u>,
the claims for the loss of use or delay and any "collateral
damage" such as testing and replacement of the panels are not
covered by the policy.  To hold otherwise would convert the CGL
policy into a performance bond -- which it plainly is not.

---

[4]      In its order dated August 29, 2006, the court concluded
that because Mr. Beers was designated as a fact witness, rather
than an expert witness, he may not testify at trial and his
report is inadmissible at trial because he has no personal
knowledge of the events in this case.  Fed. R. Evid. 602.

In addition, the court concludes that both exclusions 2m and 2n preclude recovery under the policy for the same reasons as set forth in the memorandum opinion and order entered this same day in the action styled, <u>North American Precast, Inc. and G&G Builders, Inc. v. General Casualty Company of Wisconsin, Civil Action No.</u> 3:04-1307.

## V.

It is, accordingly, ORDERED as follows:

1.   Plaintiffs' motion for summary judgment be, and it hereby is, denied; and

2.   Defendant's motion for summary judgment be, and it hereby is, granted.

The Clerk is directed to forward copies of this written opinion and order to all counsel of record.

DATED: March 31, 2008

John T. Copenhaver, Jr.
United States District Judge

20